Aaron M. Sheanin (SBN 214472)
**ROBINS KAPLAN LLP**
2440 W El Camino Real, Suite 100
Mountain View, CA 94040
Tel: (650) 784-4040
Fax: (650) 784-4021
asheanin@robinskaplan.com

*Attorneys for Plaintiff Eric Gennaro and the Proposed Class*

[Additional Counsel Listed on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ERIC GENNARO, *individually and on behalf of all others similarly situated*, <br><br> Plaintiff, <br><br> v. <br><br> VITOL INC.; SK ENERGY AMERICAS, INC.; and SK TRADING INTERNATIONAL CO. LTD., <br><br> Defendants. | Case No. <br><br> **CLASS ACTION COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

Plaintiff Eric Gennaro ("Plaintiff") on behalf of himself and all others similarly situated, brings this Class Action Complaint for damages, restitution, and injunctive relief against Defendants Vitol Inc. ("Vitol"), SK Energy Americas, Inc. ("SK Energy"), and SK Trading International Co. Ltd. ("SK Trading")[1] (collectively "Defendants") for violations of Section 1 of the Sherman Act (15 U.S.C. §§ 1, 2, 3), the California Cartwright Act (Cal. B&P Code §§16720 *et seq.*, and the California Unfair Competition Law, Cal. B&P Code §§ 17200 *et seq.* ("UCL"). All allegations herein other than those concerning the Plaintiff are based on information and belief.

## I.    INTRODUCTION

1.    On February 18, 2015, a large explosion caused significant damage to the ExxonMobil refinery in Torrance, California. As a result of the explosion, a key part of the refinery—the cracking unit—was badly damaged and needed extensive repairs. The accident and its aftermath caused an unexpected undersupply of refined gasoline in California, as the refinery supplied approximately 10% of all gasoline to the state of California.[2]

2.    The Defendants in this matter—Vitol, SK Energy, and SK Trading—are horizontal competitors and major traders in the California spot market for gasoline and gasoline blending products. Defendants realized that the refinery explosion could serve as an opportunity to artificially inflate the price of gasoline traded on wholesale spot markets in California and to increase the price of alkylates. The price of alkylates is tied directly to the wholesale price of gasoline, without unwanted scrutiny by other market participants and regulators.

3.    Immediately after learning of the explosion at the Torrance refinery, Defendants Vitol and SK Energy negotiated large contracts to supply gasoline and gasoline blending components for delivery in California. The largest of these contracts exceeded more than ten million gallons.

4.    Additionally, Defendants Vitol and SK Energy agreed with each other to manipulate, raise, and fix the spot market price of gasoline in California so that they could realize

---

[1] SK Energy and SK Trading will be collectively referred to herein as "SK".

[2] *See* U.S. Chemical Safety & Hazard Investigation Board "ExxonMobil Torrance Refinery Investigation Report" No. 2015-02-I-CA (May 3, 2017) https://www.csb.gov/file.aspx?DocumentId=6023 at p. 8.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

windfall profits on these contracts. Defendants also entered into agreements with each other to share the profits and disguise their unlawful conduct.

5.     The restraint of trade resulting from this anticompetitive conduct was coordinated by the lead traders for both Vitol and SK Energy, who were friends and former colleagues at Vitol, and it continued until late 2016.

6.     Prices for spot market gasoline contracts went up almost immediately for deliveries to Los Angeles and San Francisco. Defendants' illegal agreements violated the Sherman Act, California's Cartwright Act, and constituted unlawful, unfair, or fraudulent practices in violation of the UCL.  As a result of Defendants' anticompetitive conduct, Plaintiff and the Class were injured because they paid artificially high prices for gasoline within the State of California that they would not have otherwise paid but for Defendants' unlawful actions.

7.     Defendants' anticompetitive conduct went largely unnoticed until May 4, 2020, when the California Attorney General filed a partially redacted complaint ("AG Complaint") against Defendants for violations of the Cartwright Act and the UCL.[3]

## II.     JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a) and 1367.

9.     Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b) and (c), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and one or more of the Defendants reside in this District or is licensed to do business in this District. Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal restraint of trade throughout this District. The anticompetitive conduct alleged herein has been directed at, and has had the intended effect of, causing injury to persons residing in, located in, or doing business in this District.

---

[3] The AG Complaint may be found at https://www.oag.ca.gov/system/files/attachments/ pressdocs/Scanned%20copy%20of%20redacted%20complaint%20as%20filed.pdf.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

## III.    INTRADISTRICT ASSIGNMENT

10.    Pursuant to N.D. Cal. Civil Local Rule 3.2 (c) and (e), assignment of this case to the San Francisco Division of the United States District Court for the Northern District of California is proper because the trade and commerce affected by Defendants' illegal conduct was substantially conducted with, directed to or impacted Plaintiff and members of the Class in counties located within the Division. The San Francisco spot market is located within this Division.

## IV.    PARTIES

### A.    PLAINTIFF

11.    Plaintiff Eric Gennaro is a citizen of the State of California. He purchased gasoline from a retailer during the Class Period for his own use and not for resale, and was injured in his business or property as a result of Defendants' unlawful conduct alleged herein.

### B.    DEFENDANTS

#### 1.   Vitol

12.    Defendant Vitol, a Delaware corporation, is a privately held energy company with its principal place of business in, Houston, Texas. Vitol is registered with the California Secretary of State to conduct business in California. Vitol Holdings B.V., founded in the Netherlands, is the ultimate parent entity of Vitol.

#### 2.   The SK Defendants

13.    Defendant SK Energy is a California corporation with its principal place of business in Houston, Texas. Defendant SK Energy is an indirect, wholly-owned subsidiary of Defendant SK Trading. During the class period, SK Energy functioned as SK Trading's California Operation.

14.    Defendant SK Trading is a South Korean corporation with its principal place of business in Seoul, South Korea.  SK Trading is the parent of SK Energy International and the indirect parent of SK Energy. SK Trading is also a sister company to SK Energy Co., Ltd. ("SK Energy Korea"), the largest refiner of crude oil in Korea. All of these entities are subsidiaries of SK Innovation Co., Ltd. ("SK Innovation"), a publicly traded holding company headquartered in Seoul, Korea. SK Trading dominated and controlled SK Energy, and specifically ratified the illegal

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

conduct engaged in by SK Energy that is described herein. SK Trading and SK Energy Korea list their headquarters at the same address as SK Innovation.

## V.    AGENTS AND CO-CONSPIRATORS

15.    Throughout the Class Period, each Defendant was the agent of each of the remaining Defendants, and in doing the acts alleged herein, acted within the course and scope of such agency. Each Defendant ratified, participated in, or authorized the wrongful acts of each of the Defendants. Defendants are individually sued as participants and as aiders and abettors in the improper acts, plans, schemes, and transactions that are subject of this Complaint. Defendants participated as members of the conspiracy or acted with or in furtherance of it, aided or assisted in carrying out its purposes alleged in this Complaint, and performed acts and made statements in furtherance of the violations and conspiracy.

16.    Various persons and/or firms not named as Defendants herein participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof. Plaintiff reserves the right to name some or all of these persons as defendants at a later date.

17.    Each Defendant acted as the principal, agent or joint venture of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

18.    When Plaintiff refers to a corporate family or companies by a single name in this Complaint, it is to be understood that Plaintiff alleges that one or more employees or agents of entities within the corporate family engaged in conspiratorial acts or meetings on behalf of all of the Defendant companies within that family. The individual participants in the conspiratorial meetings and discussions did not distinguish among the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached by them. To the extent that subsidiaries within corporate families distributed the alkylate products discussed in this Complaint, these subsidiaries played a significant role in the alleged conspiracy because Defendants wished to ensure that the prices paid for such products would not undercut the

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

pricing agreements reached at these various meetings. Thus, all Defendant entities within the corporate families were active, knowing participants in the alleged conspiracy.

## VI.   CLASS ACTION ALLEGATIONS

19.     Plaintiff brings this action for damages and injunctive relief on behalf of himself and a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class ("the Class"):

> All persons or entities that purchased gasoline from a retailer within the State of California from February 18, 2015 until such time as the adverse effects of Defendants' anticompetitive conduct ceased (the "Class Period").

20.     The following persons or entities are excluded from the Class: (1) Defendants and their parent companies, subsidiaries, affiliates, officers, directors, management, employees, and agents; (2) all governmental entities; and (3) the judges and chambers staff in this case, as well as any members of their immediate families.

21.     Numerosity: Because such information is in the exclusive control of the Defendants and/or their co-conspirators, Plaintiff does not know the exact number of Class members. Due to the nature of the trade and commerce involved, Plaintiff believes that there are likely millions of class members and that they are numerous and geographically dispersed throughout the State of California such that joinder of all Class members in the prosecution of this action is impracticable.

22.     Typicality: Plaintiff is a member of the Class, Plaintiff's claims are typical of the claims of the Class members, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff and all Class members purchased gasoline at retail in the State of California during the Class Period. Plaintiff and all Class members were damaged by the same wrongful conduct of Defendants as alleged herein, their claims are all based on the same legal theories, and the relief sought herein is common to all Class members.

23.     Commonality: Common questions of law and fact exist as to all members of the Class. This is particularly true given the nature of Defendants' unlawful anticompetitive conduct, which was generally applicable to all the members of the Class, thereby making appropriate relief

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

with respect to the Class as a whole. Such questions of law and fact common to the Class include, but are not limited to:

    a.    Whether Defendants and their co-conspirators contracted, combined or conspired with one another to restrain trade in the spot market for gasoline at any time during the Class Period in California;

    b.    Whether Defendants' conduct caused the prices of gasoline sold at retail in California to be higher than the competitive level as a result of their restraint of trade;

    c.    Whether Plaintiff and the other members of the Class were injured by Defendants' conduct and, if so, the determination of the appropriate Classwide measure of damages; and

    d.    Whether Plaintiff and other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such relief.

24. <u>Adequate Representation</u>: Plaintiff will fairly and adequately represent the interests of the Class because it purchased gasoline from a retailer within the State of California during the Class Period and it has no conflicts with any other members of the Class. Further, Plaintiff is represented by counsel who are competent and experiences in the prosecution of antitrust and class action litigation.

25. <u>Superiority</u>: Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

26. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

27. Injunctive relief is appropriate as to the class as a whole because Defendants have acted or refused to act on grounds generally applicable to the class as a whole.

28.     Plaintiff reserves the right to modify the Class definition in response to information learned during discovery.

## VII.    STATEMENT OF FACTS

### A.    CALIFORNIA'S UNIQUE GASOLINE INDUSTRY

29.     Unlike in other parts of the country, gasoline reaches consumers in California through a global supply chain that commences with the extraction of crude oil and its transports to refineries via pipelines, marine tankers, and barges. After reaching the refineries, crude oil is processed into gasoline and other petroleum products. The refined gasoline is then transported to storage terminals—again, typically via pipelines, marine tankers, and barges—for wholesale distribution by truck to retail gas stations where consumers purchase the refined gasoline to fill their tanks.

30.     California's gasoline market is unique because it is geographically isolated from refining hubs in the rest of the United States. There are no pipelines that ship finished gasoline into the state; rather, there are only pipelines that ship out finished product.  If the local gasoline supply is low, additional refined gasoline and gasoline blending components are brought in via marine vessels.

31.     Moreover, California has unique, stringent vehicle emissions standards called California Reformulated Gasoline Blendstock for Oxygenate Blending ("CARBOB") that make gasoline produced in other states unacceptable. As the CARBOB specifications are unique to California and are more stringent than standards in other areas of the country, gasoline used in other states cannot serve as a substitute source of supply.

32.     Most of the CARBOB consumed in California is produced by refineries located in clusters near metropolitan centers in the Northern California's San Francisco Bay Area and in Southern California's greater Los Angeles area.

33.     One of the largest CARBOB refineries in Southern California is located in Torrance, California (the "Torrance Refinery"). The Torrance Refinery, owned by ExxonMobil Corp. ("ExxonMobil") in 2015, produces approximately twenty percent of all of the gasoline sold in

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

Southern California and approximately ten percent of all the gasoline sold throughout the entire state. The Torrance Refinery also has the capacity to produce significant quantities of alkylate, a high-quality gasoline blending component.

34.    When unexpected interruptions and outages to the supply chain occur, gasoline that meets California's unique CARBOB specifications must be sourced from outside of the state. Deliveries can take several weeks or more to arrive at California's ports.

**B.    GASOLINE SPOT MARKET TRADING IN CALIFORNIA**

35.    Participants in the gasoline "spot market" buy and sell gasoline for physical delivery within a short time frame. "Spot" purchases specifically refer to fuel that physically changes hands either at a refinery gate or at another major pricing hub for delivery on a pipeline (or via barge or cargo). Spot market sales are always completed in bulk, typically in increments of 5,000 barrels (210,000 gallons) to 50,000 barrels (2.1 million gallons).[4]

36.    The two spot markets relevant to this litigation are located in San Francisco and Los Angeles. The U.S. spot markets are[5]:



37.    The prices on these two relevant spot markets are greatly influenced by gasoline prices on the New York Mercantile Exchange ("NYMEX"). Prices on the NYMEX are determined

---

[4] *See Spot Market Pricing Overview*, OPIS By HIS Market (June 3, 2020), https://www.opisnet.com/product/pricing/spot/.
[5] *See* Scott Berhang, *Pricing 101 Part 2: Spot Fuel Markets Made Simple*, OPIS By HIS Market (Sept. 11, 2017), http://blog.opisnet.com/spot-fuel-markets-made-simple.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

in a centralized market, and all transactions on the NYMEX are publicly reported so that pricing on the billions of gallons traded daily is transparent to market participants.[6]

38.    While NYMEX prices generally reflect large-scale national and international factors, the California spot markets react to the NYMEX price as well as regional and local supply and demand conditions.[7] In many California spot market transactions, the buyer and the seller negotiate only the basis, with the final price determined by adding the basis to the NYMEX price.[8] As such, the NYMEX prices play only a limited role in gasoline pricing by local traders.

39.    "Rack" or "Wholesale" purchases are made at various points along a fuel distribution system, usually at pipeline terminals. Such purchases and transactions are conducted in approximately 8,000 gallon increments, the typical amount of fuel carried in a standard fuel truck. Companies that re-sell fuel (known as "jobbers") as well as retailers or end users (like trucking companies) acquire their fuel from the wholesale racks. Pricing on wholesale racks move up or down at 6:00 p.m. Eastern Time each day based on the movements in the California spot market.[9]

40.    Wholesale terminals are located throughout the State of California in the following geographically dispersed cities: Bakersfield, Barstow, Brisbane, Carson, Chico, Colton, Eureka, Fremont, Fresno, Imperial, Los Angeles (three locations), Montebello, Orange, Richmond, Sacramento, San Diego, San Francisco, San Jose, Stockton, Van Nuys, Wilmington.[10]

41.    Additionally, there are two common grades of CARBOB gasoline traded in the San Francisco and Los Angeles spot markets: (1) Regular CARBOB ("Regular"), which is the most commonly traded grade of gasoline; and (2) Premium CARBOB ("Premium"), which is traded with

---

[6] *See id.*

[7] *See* Scott Berhang, *Pricing 101 Part 1: Spot Fuel Markets Made Simple*, OPIS By HIS Market (Sept. 11, 2017), http://blog.opisnet.com/pricing-101-your-basic-guide-to-pricing-gasoline-and-diesel.

[8] *See* Scott Berhang, *Pricing 101 Part 2: Spot Fuel Markets Made Simple*, OPIS By HIS Market (Sept. 11, 2017), http://blog.opisnet.com/spot-fuel-markets-made-simple.

[9] *See Wholesale Rack Pricing Overview*, OPIS By HIS Market (June 3, 2020), https://www.opisnet.com/product/pricing/rack/.

[10] *See Rack Pricing Coverage by City*, OPIS By HIS Market (June 3, 2020), https://www.opisnet.com/about/rack-pricing-coverage-city/.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

far less frequency than Regular and trades at a higher price than Regular. Regular and Premium gasoline are created when alkylate, a high-quality gasoline blending component, is mixed with other blendstocks. Alkylates are essential to achieving the high octane ratings of Premium gasoline advertised for sale at retail in California.[11]

42.    Unlike the NYMEX, spot market trading of both Regular and Premium gasoline in California occurs through non-public transactions, sometimes called over-the-counter ("OTC") trades. As OTC transactions do not occur on centralized open exchanges like the NYMEX, prices on the California spot markets are not immediately made public. Refiners and traders instead rely on price-reporting services that report spot market prices from sources that participate in the market, such as refiners, traders, and brokers.[12]

43.    In fact, the most widely used reporting service in California is called the Oil Price Information Service, LLC ("OPIS"). OPIS is a subscription-based service that publishes a daily report, known as the OPIS West Coast Spot Market Report (the "Spot Market Report"), which both buyers and sellers alike use as an industry pricing benchmark in California. OPIS subscribers have access to the Spot Market Report and can also receive market updates from OPIS throughout the day that include reported deals and other industry news.

44.    The Spot Market Report includes, among other gasoline products, the prices for Regular and Premium gasoline contracts for prompt (that is, near term) delivery in Northern and Southern California. The Spot Market Report also contains forward prices for Regular and Premium gasoline.

---

[11] *See Alkylation Is an Important Source for Octane in Gasoline*, U.S. Energy Information Administration (Feb. 13, 2013), https://www.eia.gov/todayinenergy/detail.php?id=9971. Approximately 85% of gasoline sold at retail is "regular" gasoline. Another 10% is "premium" gasoline. The remainder is called "midgrade" gasoline. "[R]efineries do not produce a midgrade gasoline blend; instead, the middle-octane option is blended at the fuel pump from a given gas station's supply of regular and premium gas." *See* Tom Appel, *What is Midgrade Gas?*, The Daily Drive (Sept. 16, 2019), https://blog.consumerguide.com/what-is-midgrade-gas/.
[12] *See OPIS Methodology*, OPIS By HIS Market (June 3, 2020), https://www.opisnet.com/about/methodology/#wholesale-rack-pricing ("OPIS market assessors follow the marketplace throughout a full day of trading by constant communication with designated and approved traders and brokers to discover done deals, bids and offers.").

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

45.     OPIS depicts the "price influence chain" between spot prices and the retail prices paid by California consumers as follows[13]:



## The Fuel Price Influence Chain

**NYMEX**
Paper market, influenced by big-scale regional and international factors.

**SPOT MARKET**
Physical market, high volume, located at refinery hubs. Reacts to NYMEX and regional supply news.

**RACK MARKET**
Smaller volume market, often located off a pipeline. Follows spot market direction, changing at 6pm each day.

**RETAIL MARKET**
Street price for gasoline and diesel. Follows rack pricing, though reaction time is usually two/three days later.

© OPIS, an IHS Market company

46.     Vitol actively traded gasoline in California during the relevant period. Vitol purchased and sold spot market contracts for various types of fuel products, including Regular and Premium gasoline.

47.     Vitol also imported gasoline and gasoline blending components (such as alkylate) into California.

48.     Vitol employee Brad Lucas ("Lucas") was the primary trader at Vitol responsible for trading gasoline and gasoline blending components that were delivered via pipeline within California.

49.     While employed by Vitol, Lucas reported to John Addison ("Addison"), a Vitol executive who in turn reported to the President of Vitol Americas. While concurrently supervising Lucas, Addison was also responsible for trading gasoline and gasoline blending components delivered via marine vessels to locations throughout the U.S. West Coast, including California.

50.     SK also actively participated in trading gasoline in California. SK Energy purchased and sold spot market contracts for various types of fuel products, including Regular and Premium gasoline.

---

[13] *See* Scott Berhang, *Pricing 101 Part 2: Spot Fuel Markets Made Simple*, OPIS By IHS Market (Sept. 11, 2017), http://blog.opisnet.com/spot-fuel-markets-made-simple.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

51.     SK likewise imported gasoline and gasoline blending components (such as alkylate) into California.

52.     SK Energy employee David Niemann ("Niemann"), a senior trader, was responsible for executing trades in California and on the U.S. West Coast. Another SK Energy employee, Shelly Mohammed ("Mohammed"), was a gasoline scheduler who worked under Niemann.

53.     SK Energy functioned as the California trading arm of SK Trading. While Niemann and Mohammed were considered employees of Defendant SK Energy, SK's U.S. West Coast Trading Operation was conducted within the pervasive control and supervision of SK Trading and its subsidiaries, and SK Trading also reviewed and approved key decisions to coordinate trading activities with Vitol.

**C.     FEDERAL AND STATE LAW PROHIBIT FRAUDULENT AND DECEPTIVE TRADING WITH RESPECT TO COMMODITIES**

54.     Spot market trading of gasoline must comply with California's commodities fraud statute. *See* Cal. Corp. Code § 29504. Under this statute, it is unlawful to engage in certain fraudulent acts when buying or selling commodity contracts. *See* Corp. Code § 29536, subds. (a), (b), (c), (d).

55.     Under section 29536(c), it is unlawful to "[t]o willfully engage in any transaction, act, practice, or course of business which operates or would operate as a fraud or deceit upon any persons." *See* Corp. Code § 29536(c).

56.     In addition, the federal Commodity Exchange Act ("CEA") makes unlawful certain types of "[p]rohibited transactions." *See* 7 U.S.C. § 6c. Specifically, the CEA prohibits any transaction that "is, of the character of, or commonly known to the trade as, a 'wash sale' or 'accommodation trade.'" *See* 7 U.S.C. § 6c(a)(2)(A)(i).

57.     The CEA also prohibits a transaction that "is used to cause any price to be replied, registered, or recorded that is not a true and bona fide price." *See* 7 U.S.C. § 6c(a)(2)(B).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

### D. DEFENDANTS' UNLAWFUL CONDUCT

#### 1. Pre-Explosion

58.  Prior to his employment with SK, Niemann held a similar position at Vitol for approximately ten years. Niemann and Lucas worked together at Vitol and maintained contact after Niemann was hired by SK Energy. After SK Energy hired Niemann in August 2014, Niemann immediately began trading gasoline contracts on the California spot market. Throughout the Class Period, Niemann and Lucas kept in regular contact via instant message, emails, telephone calls, and during in-person meetings, dinners, and social gatherings.

59.  "Fluid catalytic cracking" (or "FCC") is critical part of refining crude oil. An FCC unit is a secondary refining unit that produces high-value products like alkylate.[14]

60.  The FCC unit at the Torrance Refinery produced a significant portion of all the high-octane alkylate in the State of California. This alkylate was a key gasoline blending component for Premium gasoline produced in California.

61.  On morning of February 18, 2015, there was a large explosion at the Torrance Refinery. As a result of the explosion, the refinery's FCC unit was badly damaged and needed extensive repairs.

62.  The accident caused the Torrance Refinery to shut down its FCC unit and reduce production of gasoline products (like alkylate) while extensive repairs to the unit were made. Because of this major disruption, ExxonMobil needed to replace a significant amount of lost alkylate production in California if it desired to continue refining and producing CARBOB-regulated products.

#### 2. Post-Explosion

63.  Beginning at least as early as late February 2015 and using the explosion at the Torrance Refinery as cover for their illegal efforts, Vitol and SK Energy reached agreements with each other—primarily through Lucas, Niemann, and others—and with third parties to raise, fix,

---

[14] *See Fluid Catalytic Cracking Is An Important Step in Producing Gasoline*, U.S. Energy Information Administration (Dec. 11, 2012), https://www.eia.gov/todayinenergy/detail.php?id=9150.

and otherwise tamper with the price of refined gasoline in California. This was accomplished by manipulating OPIS-reported prices in order to realize supra-competitive profits while limiting market risk.

64.     Vitol and SK Energy specifically engaged in direct or indirect trades between them that were reported to OPIS for the purpose of inflating the OPIS-published price for Regular and Premium gasoline. Vitol and SK Energy both used the services of an intermediary broker and/or transacted directly with one another. This conduct created the illusion of a supply/demand imbalance for refined gasoline and was designed to drive spot market prices to artificial highs during strategic pricing windows.

65.     These transactions were often "leveraged" because they involved the intentional taking of losses on the purchase of smaller quantities of gasoline in order to increase the profits on the sale of larger quantities of gasoline or alkylate. As an example, Defendants traded Regular gasoline contracts directly or indirectly with one another at artificially high prices early in the trading day so that OPIS would report the artificially inflated purchase price to other market participants. This in turn signaled a supply/demand imbalance to the market that caused the artificial inflation of spot market prices.

66.     Moreover, Defendants also executed intentional market-spiking trades for Premium gasoline directly or indirectly with one another and third parties in order to increase the strategic prices for alkylates. Alkylate is not a separately reported commodity on California's spot markets, despite the fact that it is a key blending component for Premium gasoline; therefore, large price contracts for alkylate were typically tied to the OPIS-reported spot price for Premium gasoline during the associated pricing window.

67.     Defendants' manipulation of spot prices for Regular gasoline also impacted the price of alkylate contract prices because spot prices for Regular and Premium gasoline often move in tandem.

68.     Accordingly, in order to realize supra-competitive profits on alkylate contracts, Vitol and SK worked together to inflate the spot price of Regular and Premium gasoline during key

pricing windows, and then coordinated their importation of alkylate into California at such supra-competitive prices.

### 3. Vitol and SK Intentionally Concealed Their Unlawful Conduct

69.     In order to hide or disguise their unlawful conduct, limit or eliminate market risk on reported trades, and share their anticompetitive profits with one another, Defendants executed secondary offsetting or "wash trades." A "wash trade" is "a form of *fictitious trade* in which a transaction or a series of transactions give the appearance that authentic purchases and sales have been made, but where the trades have been entered without the intent to take a *bona fide market position* or without the intent to execute bona fide transactions subject to *market risk* or *price competition*."[15]

70.     Defendants did not disclose these "wash trades" to OPIS and disguised them through the use of brokers and/or other third parties. These secondary trades were executed either at the same time, before, or after the OPIS-reported trades.

71.     By moving in the opposite direction of the reported trade, the secondary transaction ensured that there was little to no market risk associated with Defendants' conduct.

72.     Defendants further concealed their unlawful conduct by calling their illegal agreements "joint ventures" or "JVs"; however, these were nothing more than secret agreements between purported competitors to artificially increase spot market prices for Regular and Premium gasoline in the State of California. During the Class period, Defendants' unlawful conduct generated millions of dollars of profits for them per month, with Lucas and Neimann personally financially benefitting from their conduct.

73.     The following chart shows the unprecedented change in gasoline pricing in California relative to the United States that resulted from Defendants' unlawful conduct[16]:

---

[15] *See Wash Trades – Definition of a Wash Trade*, CME Group (June 3, 2020), https://www.cmegroup.com/education/courses/market-regulation/wash-trades/definition-of-a-wash-trade.html (emphasis in original).

[16] Severin Borenstien, *California's Mystery Gasoline Surcharge Continues*, Energy Institute at HAAS (Feb. 26, 2018), https://energyathaas.wordpress.com/2018/02/26/californias-mystery-gasoline-surcharge-continues/.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW



74. The spot market price spikes were not explained by any actual decrease in gasoline production following the explosion at the Torrance Refinery. As explained in the PMAC's Final Report: "Energy Commission staff noted that while the ESP tower and FCCU of the refinery remained offline until June 2016, the refinery could still create finished gasoline from processed blending components, some of which may be imported."[17]

75. In fact, the PMAC demonstrated that overall gasoline production in California was well within the historical five year production band immediately following the explosion and for the remainder of 2015, as depicted in the below chart[18]:

---

[17] *See Petroleum Market Advisory Committee Final Report*, California Energy Commission (Aug. 2017), https://ww2.energy.ca.gov/business_meetings/2017_packets/2017-09-13/Item_01a.pdf, at p. 12.
[18] *Id.*

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW



76.     The following chart demonstrates that the Defendants' spot price manipulation, which was in full swing not later than February 2015, impacted CARBOB spot prices in both San Francisco and Los Angeles, whose markets move in tandem[19]:



77.     Spot price manipulation increases the price of gasoline at all retailer distribution outlets supplying branded or unbranded gasoline (that is, gas sold by retail discounters like Arco,

---

[19] *See Data on California Gasoline Price Margins*, California Energy Commission (June 3, 2020), https://www.energy.ca.gov/sites/default/files/2019-05/Data_on_California_Gasoline_Price_Margins.pdf, at p. 5.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

Safeway, and Costco). In fact, the PMAC demonstrated that prices for branded and unbranded gasoline move in tandem, with branded pricing slightly higher than unbranded pricing.[20]



Figure 15: Average Retail California Regular Gasoline Prices by Branded and Unbranded Retail Sectors, 2007 to 2016

78. Defendants' repeated manipulation of the spot market price caused retail gasoline prices to be higher throughout the Class Period.

79. Defendants' gains came at the expense of consumers throughout the State of California, who use approximately 40 million gallons of gasoline per day. California is the third largest market in the world behind the U.S. as a whole and China.[21]

80. What's more, PMAC concluded its study of the California gasoline market as follows: "Californians continue to pay more than $3 billion per year for gasoline above the levels that could be explained by standard cost analysis. Whether the cause of these excess payments is insufficient competition or logistical impediments, or some combination of these factors, the magnitude of the loss justifies a very significant effort to diagnose its causes and remedy the situation."[22]

---

[20] *See Petroleum Market Advisory Committee Final Report*, California Energy Commission (June 3, 2020), https://ww2.energy.ca.gov/business_meetings/2017_packets/2017-09-13/Item_01a.pdf at p. 29.

[21] *See* Jude Clemente, *Why Are California's Gasoline Prices Always Higher?*, Forbes (Mar. 22, 2015), https://www.forbes.com/sites/judeclemente/2015/03/22/why-are-californias-gasoline-prices-always-higher/#2cfa0b4321ff.

[22] *See Petroleum Market Advisory Committee Final Report*, California Energy Commission (June 3, 2020), https://ww2.energy.ca.gov/business_meetings/2017_packets/2017-09-13/Item_01a.pdf, at p. 33.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

81.     As demonstrated by the filing of the California Attorney General's Complaint against the Defendants on May 4, 2020, Senior Assistant Attorney General Kathleen Foote and her team of antitrust attorneys were able to continue with a non-public investigation into the causes of gasoline prices following the explosion at the Torrance Refinery and uncovered secret evidence that Defendants had illegally colluded with each other and third parties to increase the price of gasoline to levels above what competition would have allowed.

82.     The affirmative conduct underlying the illegal conduct alleged herein likely ended at or around the time that Niemann left SK Energy in late 2016.

## VIII.   TOLLING OF THE STATUTES OF LIMITATIONS

83.     Plaintiff's and Class member's purchases of gasoline within four years prior to the filing of this Complaint are not barred by the applicable four-year statute of limitations and are not required to be tolled in order to be actionable.

84.     Plaintiff and Class members did not know of Defendants' illegal conduct until the California Attorney General filed its complaint against Defendants on May 4, 2020. Further, Plaintiff and Class members had no reason to believe that they paid prices for gasoline were affected by Defendants' illegal conduct prior to that date, and thus had no duty to investigate the claims set forth in this Complaint until May 4, 2020. Defendants' secret joint venture agreements were inherently self-concealing.

85.     Additionally, Defendants actively concealed their illegal conduct. For example, Vitol's Lucas mislead the California Energy Commission ("CEC") about the true cause of high prices for gasoline that followed the Torrance Refinery explosion in February 2015. On August 16, 2016, he told the PMAC, including Senior Assistant Attorney General Foote, that high gasoline prices were caused by a lack of transparency by ExxonMobil, rather than Defendants' illegal manipulation of spot market prices. Lucas stated:

> So you know, last year we brought in quite a few cargos into L.A., both alkaloid (phonetic) and finish CARBOB that went through Kinder Morgan's system and sold direct to Exxon and some other refiners. You know, one of the big things that this whole conversation has entailed is about the high prices. One of the reasons why, in my opinion, was the lack of transparency with what was going on with Torrance. Because if you remember when it first blew up back in

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

February, there was like an eternal rolling one-month period where they were going to get back up and running. And they kept saying next month, next month, next month. So the trading companies in general, it takes four to five weeks to ship a cargo out, if Exxon is coming back up they're not going to ship into closed ARB. So because there was no real timeline of when Exxon was going to come back up and running, we would generally not—you don't put cargos on the water and ship them to the West Coast just on a punt, basically, hoping that you can sell them when they get there. That's what happened with that one cargo that was done by another trading company who sent it out there, at which point in time the market had collapsed, and so he was unable to sell it, and so he sailed it away again. So that's what happened with that one. So if there was more transparency with what was going on with refinery maintenance, when it was going to come back up, it would have allowed us to see if it was more—if we were going to be able to land these cargos and actually into a competitive market. If Exxon is back up and running the market is going to fall dramatically. So basically kind of that lack of information kept cargos at bay. There were still a lot shipped into the West Coast, but not as many as could have been or would have been done. If we had actually known that Exxon was going to be down for over a year there would have been a much bigger import play over that time frame.[23]

86.     Defendants misled OPIS about the true nature of their trading activities by reporting artificially high spot trades directly or indirectly between them, but concealing the existence of offsetting wash trades that reduced or limited any market risk in the primary trade.

87.     Additionally, the California Attorney General, as representative of the people of the State of California, obtained tolling agreements with Defendants that are applicable to the claims of Plaintiff and the Class, in whole or in part. These tolling agreements have effective dates of August 3, 2018, and March 8, 2019, respectively. Defendants and the California Attorney General subsequently executed additional tolling agreements to extend the termination dates of the tolling periods specified in the original agreements. These termination dates have not passed as of the filing of this Complaint.

88.     Accordingly, to the extent that tolling is necessary to advance some or all of the claims alleged by Plaintiff and the Class, the four-year statute of limitations governing claims under the Sherman Act, the Cartwright Act, and the UCL were tolled at least until May 4, 2020 pursuant

---

[23]    *See*    https://www.energy.ca.gov/data-reports/planning-and-forecasting/petroleum-market-advisory-committee, August 16, 2016 Meeting Transcript at pp. 129:24-131:10.

1    to the injury-discovery rule, the doctrine of fraudulent concealment, and by virtue of express tolling

2    agreements between the California Attorney General and Defendants.

3                              IX.    **VIOLATIONS ALLEGED**

4                                    **COUNT ONE**

5    **Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)**
                              **(Injunctive Relief Only)**
6                              **(Against all Defendants)**

7        89.    Plaintiff hereby repeats and incorporates by reference each preceding paragraphs as

8    though fully set forth herein. Plaintiff brings this claim on behalf of himself and the Class.

9        90.    Defendants entered into and engaged in a continuing combination, conspiracy or

10   agreement to unreasonably restrain trade or commerce in violation of Section 1 of the Sherman Act

11   (15 U.S.C. § 1) by artificially restraining competition with respect to the price of gasoline within

12   the State of California.

13       91.    Defendants' activities constitute a *per se* violation of Sections 1 of the Sherman Act.

14       92.    Defendants' anticompetitive and unlawful conduct has proximately caused injury to

15   Plaintiff and members of the Class by restraining competition and thereby raising, maintaining

16   and/or stabilizing the price of gasoline at levels above what would have occurred if competition

17   had prevailed. Plaintiff and members of the Class were injured in their business and property by

18   paying more for gasoline than that would have paid in the absence of Defendants' conduct.  Plaintiff

19   and members of the Class continue to be threatened by loss or damage by a violation of the antitrust

20   laws.  For this conduct, Plaintiff and members of the Class are entitled to entitled to injunctive relief

21   pursuant to 15 U.S.C. § 26.

22                                   **COUNT TWO**

23   **Violation of the Cartwright Act**
     **(California Business and Professions Code § 16720 *et seq*.)**
24                              **(Against All Defendants)**

25       93.    Plaintiff incorporates by reference and realleges the preceding allegations as though

26   fully set forth herein. Plaintiff brings this claim on behalf of himself and the Class.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

94.     Defendants entered into and engaged in a continuing combination, conspiracy or agreement to unreasonably restrain trade or commerce in violation of California Business and Professions Code § 16720 *et seq.* by artificially restraining competition with respect to the price of gasoline within the State of California.

95.     Defendants' activities constitute a per se violation of the Cartwright Act.

96.     Defendants' anticompetitive and unlawful conduct has proximately caused injury to Plaintiff and members of the Class by restraining competition and thereby raising, maintaining and/or stabilizing the price of gasoline at levels above what would have occurred if competition had prevailed. Plaintiff and members of the Class were injured in their business and property by paying more for gasoline than that would have paid in the absence of Defendants' conduct.  Plaintiff and members of the Class continue to be threatened by loss or damage by a violation of the antitrust laws.  For this conduct, Plaintiff and members of the Class are entitled to entitled to treble damages and injunctive relief pursuant to California Business and Professions Code § 16750(a).

## COUNT THREE

### Violation of the Unfair Competition Law
### (California Business and Professions Code § 17200 *et seq.*)
### (Against All Defendants)

97.     Plaintiff incorporates by reference and realleges the preceding allegations as though fully set forth herein. Plaintiff brings this claim on behalf of himself and the Class.

98.     Defendants committed acts of unfair competition, as described above, in violation of the UCL.

99.     Defendants' conduct constitutes an "unlawful" business practice within the meaning of the UCL, and includes, without limitation, the following:

a.   Violating the Sherman and Cartwright Acts, as set forth above;

b.   Engaging in wash sales and otherwise manipulating the benchmark prices reported on the California gasoline spot market in violation of California Corporations Code §§ 29535, 29536, 29537, 29538) and the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.*

100.    Defendants' conduct separately constitutes an "unfair" business practice within the meaning of the UCL because Defendants' practices have caused and are "likely to cause substantial injury" to the Plaintiff and the members of the Class that is not "reasonably avoidable" by them.

101.    Defendants' conduct, as alleged herein, is and was contrary to public policy, immoral, unethical, oppressive, unscrupulous and/or substantially injurious to consumers. Any purported benefits arising out of Defendants' conduct do not outweigh the harms caused to the victims of Defendants' conduct.

102.    Defendants' conduct is also "unfair" because it is contrary to numerous legislatively declared policies, as set forth in the Sherman Act, the Cartwright Act, the California Corporations Code, and in the Commodities Exchange Act. Here, Defendants' conduct not only violates the letter of the law, but it also contravenes the spirit and purpose of each of those statutes. The conduct threatens an incipient violation of each of those laws and has both an actual and a threatened impact on competition.

103.    Defendants' conduct, as described above, also constitutes a "fraudulent" business practice within the meaning of the UCL. Defendants' trading activity on the California gasoline spot market fraudulently raised the price of gasoline above the competitive level through fictitious "wash" trades and other manipulative conduct that did not shift economic risk for the transaction to an arm's length counterparty. This conduct was designed to deceive—and did deceive—other market participants about the true supply and demand situation for gasoline in order to artificially increase the price of gasoline in California.

104.    Plaintiff and the members of the Class have suffered injury in fact and have lost money as a result of Defendants' violations of the UCL in that they paid more for gasoline than they would have paid in a competitive market. They are therefore entitled to equitable and injunctive relief including restitution and/or disgorgement of all revenues, earning, profits, compensation, and benefits that were obtained by Defendants as a result of such business practices, pursuant to California Business and Professions Code §§17203 and 17204.

## X.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff seeks judgment against Defendants as follows:

1.      This action may proceed as a class action, with Plaintiff serving as the Class Representative, and with Plaintiff's counsel as Class Counsel;

2.      Defendants have contracted, combined and conspired in violation of the Sherman Act and Cartwright Act;

3.      Defendants have violated the UCL by engaging in conduct that constitutes unlawful, unfair and fraudulent business practices;

4.      Plaintiff and the Class have been injured in their business and property as a result of Defendants' violations;

5.      Plaintiff and the Class are entitled to recover treble damages, and that a joint and several judgment in favor of Plaintiff and the Class be entered against Defendants in an amount subject to proof at trial;

6.      Plaintiff and the Class are entitled to restitution and/or disgorgement of all revenues, earning, profits, compensation, and benefits that were obtained by Defendants;

7.      Plaintiff and the Class are entitled to pre-judgment and post-judgment interest on the damages awarded them, and that such interest be awarded at the highest legal rate;

8.      Plaintiff and the Class are entitled to equitable relief appropriate to remedy Defendants' past and ongoing restraint of trade, including:

    a.   A judicial determination declaring the rights of Plaintiff and the Class, and the corresponding responsibilities of Defendants; and

    b.   Issuance of a permanent injunction against Defendants and their parents, subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf from violations of the law as alleged herein.

9.      Defendants are to be jointly and severally responsible financially for the costs and expenses of a Court-approved notice program through post and media designed to give immediate notification to the Class;

10.     Plaintiff and the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1   11.     Plaintiff and the Class receive such other or further relief as may be just and proper.

## XI.     <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a trial by jury, pursuant to Federal Rule of Civil Procedure 38(b), of all issues so triable.

DATED:  June 4, 2020

ROBINS KAPLAN LLP

By: */s/ Aaron M. Sheanin*
    Aaron M. Sheanin

2440 W El Camino Real, Suite 100
Mountain View, CA 94040
Tel: (650) 784-4040
Fax: (650) 784-4021
asheanin@robinskaplan.com

Hollis Salzman
Kellie Lerner
William V. Reiss
Noelle Feigenbaum
Matthew J. Geyer
**ROBINS KAPLAN LLP**
399 Park Avenue, Suite 3600
New York, NY 10022
Tel: (212) 980-7400
Fax: (212) 980-7499
hsalzman@robinskaplan.com
klerner@robinskaplan.com
wreiss@robinskaplan.com
nfeigenbaum@robinskaplan.com
mgeyer@robinskaplan.com

K. Craig Wildfang
Thomas J. Undlin
Ryan W. Marth
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Tel: (612) 349-8500
Fax: (612) 339-4181
kcwildfang@robinskaplan.com
tundlin@robinskaplan.com
rmarth@robinskaplan.com

*Attorneys for Plaintiff Eric Gennaro and the Proposed Class*